5-140 for Nippon Steel Corporation versus the United States. Good morning to all four council. Mr. Reynolds, welcome. Please proceed. As Chief Judge Michel just said, I'm Neal Reynolds and I represent the commission. I'll be speaking for nine minutes and Mr. Stewart will be speaking for six. And I'd like to reserve two minutes of my time for rebuttal. Your Honor, this appeal involves a situation in which the lower court, the Court of International Trade, has again applied the substantial evidence test improperly to the commission's affirmative injury determination in tin mill products. Improperly is a stout word. Tell us what you mean by improperly. Well, I think specifically, Your Honor, this court in Nippon 3, its earlier decision in the case, told the lower court that there were three specific things that it should not do again in this case. The first is to refine facts. The second was to reassess witness credibility. And the third was to interpose its conclusions on issues relating to injuring causation for that of the commission. And what's happened here is that for each of those directions that this court told the lower court not to do on remand, the court has again done each of them. It sounds to me like you're saying that whether or not Chief Judge Rustani was correct on the merits, her conduct violated the terms of our remand instructions and is reversible per se just on that basis. Is that your first contention? Well, I think that actually that is one of the arguments we make. But our primary contention and our primary focus here is that our decision is supported by substantial evidence and should be affirmed by this court. One of the arguments that we make, as you've gone through our briefs, you'll see that what we do is for each of the issues that are raised here— if your primary argument is that she was wrong on the merits, then why would you want to spend scarce time arguing that she was in violation of the mandate? Well, Your Honor, let me get to the merits. I think that's the quick answer. Well, can I ask you about the merits? And this goes to your earlier point. I mean, this is about facts, and it's about the evidentiary standard, and it's about conclusions. And what I'm having difficulty with is deciding the connection between the facts and the conclusions. In other words, a couple of examples. One, the question of sensitivity. Is it highly sensitive? Is it moderately sensitive? Is it low sensitive? And she says moderate to low. The International Trade Commission says highly. How does that translate to a conclusion? I mean, even if she's right on her facts and she'd support, you know, and you're not, does that mean that the ITC's conclusion in that regard should be reversed? And the other question I have is just related, and then maybe you can respond, is like with the affidavits, when they talk about whether or not it was the primary reason, whether Price was the primary reason for entering into these contracts, or whether it was one of several. It seems the disagreement between the Commission and the court is whether it was the most important fact or just on the list of important facts. I think that's actually, your last statement is pretty correct, which is… So how does that translate into the result? Well, the issue is, I guess my question for you is, if you're saying how does it translate into… We asked the question. That's right. If you're saying how does it translate into the result for the lower court, which is was our decision supported by substantial evidence or not, the fact is much of the disagreements between the court and the Commission on the level of facts actually don't necessarily lead to the conclusion that the court drew, primarily because the standard here is not whether the lower court or we had the better arguments or the better analysis of the case, but simply whether the factual analysis we performed here and taking into account both data that supports us and data that detracts from our analysis is a reasonable one. And the problem with the lower court's analysis is that although you can, as the two dissenting commissioners have said, they would agree with the court that the facts, the weight of the evidence for them and for the court shows that there was a negative here, that there wasn't a significant price effect from subject imports and there wasn't a significant volume effect and impact in the industry from subject imports. But the point here is that the court itself has to establish that the data and the record on that side compels the finding that she is directing us to make, that compels a negative determination. And what we are arguing here in our briefs is that you can't, when you look at the facts that we have cited on issues like underselling and price sensitivity and substitutability of the subject in the domestic merchandise, you simply can't say to yourself, given the large volume of evidence we've cited, that all of the record evidence here compels a negative finding. At best, you can say that this is a case that would support a reasonable decision on both sides. But the fact of the matter is when we look at underselling growing through the record, although the lower court disagrees with us, the record here shows that underselling was growing and became prevalent in almost all of the large purchasers in the market in 1999, that there was a direct correlation between that growing level of underselling in the market and the— Is it this case really about what Gerald Meadows meant when we said that to do the substantial evidence analysis and decide whether the ultimate determination of the commission was supported by at least that level of evidence, that you have to look at what detracts from the conclusion as well as what supports the conclusion. Now you seem to give a one-word definition of how you do that, because as I heard you use the word reasonable several times. You're in effect saying if the conclusion was reasonable, then that's enough no matter how much the detraction factor weighed. And I'm struggling with that because it seems to me that at some point of powerful detracting evidence, it couldn't be reasonable anymore. So where is the tipping point? How are we supposed to decide when the contrary evidence, that is contrary to the finding of the commission, is so severely—is sufficiently strong that the finding just doesn't have legs under it anymore? Right. I mean, that is the issue here, which is that the substantial evidence test does at some point suggest that a lower court and this court can look and say that there is such overwhelming evidence on one side of the case that it detracts from the minimal amounts of evidence found by the commission or the Department of Commerce on the other side of the case. It is a judgment call. But the fact is that at its essence, the substantial evidence test is a test that whether you look at this court's decisions in U.S. Steel and Gerald Meadows, the Supreme Court's decision in Universal Camera in Consolo, the test is intended to be a deferential one to the fact-finding authority. That doesn't help to say that it's supposed to be deferential. The issue is how much deference. What degree of error can the commission commit and still be affirmable? It's not helpful, at least to me, to say it has to be deferential. Yes, of course, we all know, we all agree, but how much? Where's the tipping point? How do you decide whether the detracting evidence so undermines the supportive evidence that the particular finding or the ultimate conclusion can't stand up in the eyes of the law? Well, to answer your question directly, I think that as opposed to in the specifics of this case, because I think in the specifics of this case, our argument is you're not even close to that point where you get to a question of, well, is there just this minimum amount of evidence that supports the commission's analysis? Our argument is that there is a very large amount of evidence, whether it's the underselling data that does support it. The problem is as you look through this court's decisions on substantial evidence and the Supreme Court's decision, the best definition you're going to get in terms of what is substantial evidence is that it's more than a mere scintilla, but less than the height of the evidence. Well, I'm asking you for a better definition because in Nippon 3 and in Gerald Meadows and in U.S. Steel Group and the other cases, I can't see that we've said anything intelligible. I can't apply that test. It's too vague. It's too wishy-washy. It doesn't give me anything to put my teeth into. So I'm asking you for some help. Well, I'm going to give you some help here, which is I think one of the things that's important about this case, and it gives some meaning to the Gerald Meadows definition of evidence that detracts from the commission's analysis, is that I think what Gerald Meadows is doing there when it says that and when other cases on substantial evidence say those things, what they really want to talk about is has the commission considered this evidence and reasonably that is the evidence that's detracting from its analysis and that's being pushed by Nippon here? Has the commission considered it? Let me give you a hypothetical that picks up your suggestion. Suppose that there are 100 findings by the commission in a case. And suppose that in every one of the 100 findings, a judge of the trade court says, I think the detracting evidence is so strong that all 100 of these findings cannot stand. And then suppose that on the remand, the commission gives a reason in each of the 100 instances for why it reached the conclusion that it did despite the detracting evidence. Are you saying that the mere fact that the commission has given a reason, one reason for every one of the 100 fact findings, automatically meets the substantial evidence or reasonableness test? No, I'm not saying automatically. But I do think that the issue here for the court is that if our response to each one of those 100 factual issues that the court raised considers the evidence, considers all the evidence that the lower court pointed to, and then does a very good and reasoned job of saying why it gave little weight or it found it to be outweighed by other evidence in the record, then that is something that you should take into account. You need to give deference to, and you need to affirm the court's, the commission's finding. Ultimately, I think in our regard— Even if it's wrong? Well, that's, I guess, the— In other words, suppose on finding number one, on remand, the trade court having overturned the finding as not supported by substantial evidence because of the detracting evidence. And so on remand, the commission articulates, let's say, in 100 pages, all the reasons why it found the detracting evidence not strong enough to overcome the supporting evidence, and therefore it adheres to the findings. And it writes it up in an elaborate 100-page explanation, beautifully written. Are you kind of hinting that the quality of the articulation somehow makes the finding immune from subsequent overturning by either the trade court or this court? I think there are two things, and they're related issues. The first one I just want to do quickly, which is— And this is not a direct answer, so I apologize. In U.S. Steel, the court said that if you find that one or two subsidiary facts is not supported by substantial evidence, then you can look at the remaining facts cited by the commission to assess whether those facts that you do find to have been correctly analyzed and found by the commission support substantial evidence. That's why I'm giving you a hypothetical in which the trade court has overturned 100 out of 100 facts findings. And on the remand, the commission does an elaborate explanation for each of the 100 of why they nevertheless adhere to the original findings, taking the view that the detracting evidence doesn't detract enough. Right. Well, I think in that case— Because in that case, the outcome obviously stands or falls on the particular fact find. Right. And the issue is, early you said, assume the quality of that analysis by the commission. If the commission's analysis is a quality analysis, it is a reasonable analysis. And the essence, as this court said in U.S. Steel and other cases, is the essence of the substantial evidence test is that whether what we do is reasonable, whether what our analysis is is reasonable, and whether we've considered the evidence in the record, including that detracts, and provided a reasoned analysis on the whole of that evidence. And that's the issue here. But if reason just means giving reason, making them specific, making them thorough, making them comprehensive, but not necessarily persuasive, then it seems to me we get a very different kind of test. If they have to be comprehensive and clear and specific, et cetera, et cetera, and persuasive, then I would think that's quite a different test. Well, what's interesting is the word— Does it have to be persuasive or not? Well, persuasive is an interesting choice of words. If the issue is are you persuading the trier of fact, what you're suggesting to me is that there is a preponderance of the evidence standard there that's implicit in the word persuasive, I think. If you're saying it's persuasive such that someone who is a reasonable person could have come to the conclusion that the commission did, then that is what the substantial evidence test says is what the Supreme Court has said is required here. It is what this Court has consistently said is required. It's not that we have the most reasonable or a more reasonable issue. It's just whether this Court, when it looks at the analysis and the findings we've made, is something that a reasonable decision-maker could make. Even if there's only—if you're looking at, say, there's ten reasonable decision-makers, eight of them find the other way, and two of them would find our way, I would say that that's still reasonable under the substantial evidence test. If that's true, Mr. Reynolds, then why would Congress have created judicial review to begin with? Because under that standard, I would suggest to you there would be an extremely rare case where either the trade court or this court could ever overturn the determination of the commission. Why even have the expensive, time-consuming judicial process if it almost always has to result in an affirmative? Well, first things, I don't—we are not arguing here that there is never a situation in which a reviewing court could find that there is a substantial evidence test. For example, this Court did that very thing in Gerald Mell's in Allegheny-Gludlum, and in response to those decisions, the commission changed its decision on remand. So we're not saying that there's never a situation in which the court couldn't find a lack of substantial evidence on the record. But the issue is, for you—I mean, I'm not going to sit here and tell you that in only one of a thousand cases could you ever reverse us or tell us to enter a particular— but the fact is that the Supreme Court has said that basically directing the commission to take a particular outcome is essentially something that should be done in real circumstances. That's what—I think that's the premise of the Supreme Court's finds in Inez v. Rature and in Florida Power and Light. I'm trying to get you to imagine what we should discern Congress intended when it legislated judicial review in the first place. It can't be that it intended a rubber stamp, that 99 out of every 100 commissioned decisions would have to be upheld. No, and that's not what— Because that would be, to ascribe to Congress, a farcical approach to this, a fig leaf, to pretend to have judicial review, but you wouldn't have the substance. You'd only have the appearance of it. So if Congress intended it to have meaning, then how do we give it meaning? You seem to be saying as long as the commission's explanation on remand is not on its face unreasonable, that's good enough. But if that is a fair way to frame the test, then I think we're back to 99% of the cases will always be affirmative. Well, the role that I think that Congress has envisioned is not a rubber stamp office. That is not what we're saying, and I don't think that statement's made in our brief. There are very specific roles, obviously, for the court here, and I don't mean to minimize them, but this court and the CIT routinely gets itself involved in issues, decisions, interpreting the laws and meaning of the law. Consider this. Congress could have said, look, we've created a specialized staff of economists and price analysts and so on. We have a handful of presidentially appointed commissioners who have a background in this field. We're just going to keep the courts out of it altogether because there's better expertise in this agency. The commissioners will be a check on the staff. The staff will be a check on one another. The general counsel will make sure it has a proper legal overlay. We just won't have judicial review. That would have, in my view, been a perfectly rational choice for the Congress to make, but obviously they made the contrary choice. They obviously wanted some sort of check and balance by Article III judges, both trial and appellate, even though, I'm going to say at least for myself, even though I concede I have far less expertise than the commissioners and their staff. But Congress seemed to not be worrying about relative expertise. Congress seemed to want some Article III judge check and balance on what the commission and its staff do. Well, I think you're right in the sense that if Congress had wanted to give subplenary authority to the commission to make fact findings, it wouldn't have given judicial review to the courts here. Moreover, it wouldn't have given the substantial evidence test to the courts if the courts were simply to rubber stamp 100 out of every 100 decisions. The fact is, under the substantial evidence test, there is, quite frankly, a minimal amount of weighing here because you have to look at whether the evidence on the other side of the case, the other side of the commission's determination, is so overwhelming that the commission's determination is meaningless. It's arbitrary. It's unreasonable. Why is it not fact finding? But it isn't. You cite language that I wrote in Nippon III. Now I'm beginning to think it was stupid language. Maybe it's nonsensical to say to the trial judge, you're not allowed to do fact finding. Because how can she apply the substantial evidence standard in the light of Gerald Mettle to weigh detracting evidence and protracting evidence and do some kind of net assessment without doing, quote, fact finding? It may be unavoidable. But, Your Honor, that's the distinction here, I think. There are differences between fact finding agencies and fact finding courts in their role as fact finders and the role of a court as an appellate body that reviews for reasonableness. And that is what the circuit courts, that is what this circuit does in our situations, that is what the lower court does. It is not to refine facts. And that is the temptation in these cases, particularly for the lower court. He doesn't say she's refining the facts. He's saying the commission found the facts in a way the law cannot condone. That's different than saying, I'm substituting my 100 facts for the commission's 100 facts. What she did was to knock down many of the commission's facts as legally unsustainable. At least, that's how I read her opinion. And one criticism I could have of how she got there was that she had to do some fact weighing, which sounds like fact finding, ostensibly prohibited. And yet, if she doesn't do some sort of weighing, how can she measure the detracting evidence against the support of evidence? But it's precisely the type of weighing that she did in this case that you're not supposed to be doing under the substantial evidence test. It isn't a situation in which she said, well, the facts relied on by the commission, with the exception of our understanding, the facts relied on by the commission are mistaken. What she does in most of these situations, on most of these issues, is say, well, the commission says X, Y, and Z for witness credibility, for purchase of B and E and F. And then turns around and says, but I find that facts A, B, and C, which the commission discussed, by the way, outweigh that. And the point is that the only way you can get to that conclusion is if you say, and this is what the court has to say, that the commission's discussion of facts A, B, C, and X, Y, and Z, and its weighing of those, and its analysis of those, were unreasonable. They were unreasonable, and no one could have come to that conclusion. But the difficulty is, I mean, as Judge, forget the 100 nothing. This goes to the Chief's initial point, where what is the tipping point? Let's assume there were 25 factors that she was looking at. And you're right that in 12 of those, she did some weight. She went beyond her role. But in the remaining 13, we really do think that she properly performed her role, and indeed, there was not substantial evidence on the record to support the commission's findings. What are we supposed to do then? Well, I think that's where U.S. Steel comes in, which is U.S. Steel specifically says, if you have a series of facts found by the commission that are supported by substantial evidence and were reasonably analyzed, and then a series of mistaken findings, then you need to assess whether if you remove those mistaken findings or findings that were not supported by facts from the weight of the evidence, and what is left still constitutes substantial evidence to support that finding, then you have to decide. In other words, we have to weigh which of those facts was relevant and germane and necessary to the findings, right? We have to weigh, then, if there are 25 different items we're looking at, we have to weigh the significance of those relative to the findings. But the problem with the weighing in that situation, Your Honor, is that it becomes tempting. If there's a different... If you're looking at the U.S. Steel analysis, you still have to come to the assessment of whether there's still substantial evidence to support it, and there is a level of weighing there. That's what U.S. Steel requires. The problem with the lower court's analysis, though, and to the extent there's a difficulty presented here, is that when you weigh evidence, there's a temptation to move from the role of appellate reviewer, who's looking for reasonableness, into the world of fact-finding. And I think that's what Chief Judge Mischel was mentioning. When you look at her decision, there are points in her decision where she's clearly making a series of fact-findings that are different than our findings, in which the majority disagrees with. You're not quite giving Judge Prost the full benefit of the power of her observation. I read her question as including this notion. Forget about what Chief Judge Rastani did. We now have to look at all this evidentiary stuff ourselves. We have to do the supportive versus detracting analysis. And in her hypothetical, about 25 factors, if we think the commission was sustainable on half the factors and reversible, or not sustainable on the other half of the factors, as she quite frantically asked, what are we to do then? Well, again, I'd point to the court that U.S. Steel tells you that you should really have to sit there and assess whether what's remaining is substantial evidence. The problem here is that there's a consistent line of authority that this court has stated in case after case involving our decisions, that you shouldn't be weighing the evidence. And I understand that there is a judgment... I've heard the weighing argument before. Let me ask you one more thing. How do we even know on this hypothetical of we think no substantial evidence to support 13 of these factors or 12 and substantial evidence for that? How do we even know that the commission would have necessarily reached the same result given our conclusion that there was no substantial evidence to support its conclusion with regard to 13 of those factors? I mean, that is the U.S. Steel analysis. There's a two-step analysis, I would suggest, on the U.S. Steel, which is if you determined that, say, 13 of our findings were supported by substantial evidence and did support us, and 13 were not, then you can on your wonderful U.S. Steel say, well, we can go ahead and decide whether that would have been enough to support the commission's finding. If you decide it isn't, and you don't know whether the commission would have continued to issue that affirmative determination, I would suggest that the obvious decision is to remand back through the CIT to us to assess whether the remaining evidence is sufficient to support... But not in every case, only where we couldn't tell whether the commission would adhere to the same outcome? Well, I think that's... It's a difficult call for you. Yes, that's what you generally should do. But if we think it's not a difficult call, you concede that we could end the case here? Yes, Your Honor. Can I ask you one technical... Not technical, but at least it's not as grandiose as the other things we've been talking about. Did the commission find that there was no domestic price premium? Yeah. They did. And there were two dissents on that-ish question, right? Yes. They disagreed. But I want to... They said that the evidence didn't show that there was a price premium necessarily. And they said even if it existed, there was a correlate. Even if it existed, it was offset by other considerations that people used during the price negotiation discussions, such as quality, things like that, to ratchet down pricing. So even if there was a conclusion that there was a domestic price premium, you're saying the commission would still say... Well, what it's saying is there wasn't... There was a consistent price premium over time from the record when you look at the underselling debt. And they thought that there wasn't a price premium. They agreed with the fact that there was a lead time advantage, but they didn't see it in the facts. And part of the reason they said it wasn't just simply that the facts didn't show it, but they felt that the reason the facts didn't show it were that there were other considerations that went into the pricing discussions with suppliers. All right, Mr. Reynolds, thank you for the helpful exposition of some complicated circumstances. You're welcome. Mr. Stewart, you... Under our prospective time allocation, you're entitled to 6 minutes. Obviously, no need to repeat anything that's already been said, but if you have additional points to make, please proceed. Thank you, and good morning. Several quick points. With regard to the standard of review and what does it mean, when the law was put in place in 1979, it replaced what had come to exist in CBD cases of de novo review and was intended to supply the same type of review that exists for other administrative determinations, and there is, of course, thousands of decisions, including decisions of the Supreme Court, where the objective of trial courts and the appellate courts that are reviewing it is not to replicate the work of the fact finder. I agree with the comments of the ITC's counsel with regard to what you should do under your hypothetical, which is if you, in fact, can't decide, you should remand with whatever findings you, in fact, have made. To go to a couple of the points that Judge Post made, issues that were raised by the lower court, such as whether it is a price-sensitive product, were deemed relevant by the courts as they were deemed relevant by the agency in terms of whether one would expect movement of volume on the basis of small changes in price. What is lost, and we believe that as this court goes about examining the record, that the starting document should be the second remand determination of the agency, because we think that there is very little doubt that this court will affirm the commission as having made a decision that is reasonable. It is not simply a question of weighing evidence. There is contradictory evidence in the record, and what the lower court repeatedly goes back to is the fact that there were witnesses who stated, no, no, we don't buy on price. We buy on quality, we buy on other aspects. And there is a host of information that the commission goes through in great detail to say, well, they said this, but they're contradicted by this, over and over and over again. And it is exactly the province of the fact finder, exactly the province of the agency that looks at hundreds of industries to be able to evaluate what one does with that type of contradictory information. So we don't think that this is a difficult case. This is a case in which imports in the period of investigation increased by more than 85%, when every aspect of the domestic industry was in decline, when prices were falling, and when the tables of underselling, done three different ways for the commission, for the court, demonstrate over and over again increased presence, increased underselling, increased volumes lost. It's a relatively simple case. In fact, since we weren't the counsel in the original investigation when I was reading the record, I kept saying to myself, how on earth could the trial court be getting this so wrong? How difficult is this? This is a case that screams out that there is causation and that there is underselling, and hence the commission's determination, which in my view is well done, should be affirmed. Mr. Stewart, how many days of live testimony? These cases typically have one day. No, in this case. I believe it was one day. That's the way it looked to me, but our appendix, of course, doesn't have the entire transcript in it, so I just wanted to be sure. So what we have then is one day of live testimony, all kinds of charts and graphs and data compilations from investigative efforts. Do we also have depositions? No. No. So it's kind of basically two forms of evidence, live testimony and empirical economic data, questionnaire answers and such. Correct. The way the process goes is that you have the ITC staff who sends out questionnaires to both the industry, the importers, the purchasers in these types of cases. They then will do follow-up questions, and so you will see notes from case analysts and investigators that will be in the record. And then you have pre-hearing briefs, a pre-hearing staff report, and the opportunity for people to present their views. Right. Now, on another aspect of this, is it your understanding of the core legal standard that price has to be, that is the allegedly abnormally low price of the Japanese canning steel, has to be the primary reason for shifting to purchase more from the Japanese and less from the previous U.S.-based makers of the same specialty steel? No, that's never been my understanding of the law. In fact, there have been cases in the past where the imported product is higher priced because it's perceived to be a higher quality. In fact, if you look at the record and what the Commission cites in its second remand, there is at least one of the purchasers who talks about the fact that there may be a price premium for the Japanese product because of higher quality, yet they are selling the product at lower prices against domestic product. The issue in the statute is simply whether import competition from dumped product is either underselling or otherwise affecting the prices in the domestic industry, i.e., is there a downward trend in the prices that is occurring or are prices being prevented from rising? We had both of those situations in spades in this particular case, a very strong case in terms of the price underselling and the price depression. Let me rephrase it because I'm not sure I was clear enough. Suppose I'm the buyer for a can maker in the U.S., and I have been buying from numerous U.S. companies, and I have dissatisfaction with the quality or the deliverability, etc., of the product from this array of U.S. makers. And as a result, I'm deciding to begin to buy some portion from foreign makers. And in addition, the foreign makers are selling at a lower price than the average price offered by the American makers. So I start out worried about quality. I want to buy foreign because I'm concerned about the U.S. quality. But in addition, the foreign price is low. That's maybe not a realistic case, but just hypothetically. In that circumstance, how is one to decide whether price was causing the effects, whatever those effects were, adverse effects to the U.S. makers? How does one decide that it was price rather than these other factors? Well, it would be, I think, in fairness, Your Honor, it would be a difficult factual matter for the commission to consider. But if that were actually the case, what one would expect to see is that there would not be other price effects in the marketplace. You would not expect that that price would be being used against domestic producers to get them to lower their price. You wouldn't expect domestic producers to be lowering their prices simply because somebody chose to shift some volume to another supplier. Those things can happen in any industry. In an industry like this where the cost of the 10 mil steel is a very large percentage of the end product that the purchaser is making, the concept that price is not a major driver defies common sense. But are you saying then that if price is more than a minimal factor, that's enough? Even if there are eight other factors of greatly higher power? Correct, and the way the commission would normally look at that if they considered price not to be the first or foremost issue is that they would be looking for clear indications that there was significant underselling and that that significant underselling was in fact leading to some of the lost sales or movement in product way. And that's not what this record shows. That's not what this record shows in any individual account. Where there are quality problems, those quality problems are not across the board, and the movement of volume is not across the board away from people allegedly with quality problems. Thank you, sir. Mr. Derling. Thank you, Your Honor. I would like to start by just clarifying what I think are mischaracterizations of Judge Rustani's thoughtful decision in this case. First, it's very important, her decision does not rest on her assessment of the credibility of the witnesses. That is not the basis of her determination in this case. Rather, Judge Rustani completely understood the clarification on her role that this court provided her previously, and she systematically, carefully, and painstakingly went through each factual claim that the commission made, each assertion, each conclusion, and she tested those assertions against the evidence on the record. And she found two broad categories of mistakes. In some instances, she found that when she looked at the underlying supporting evidence, the conclusion being drawn by the commission was not supported by the underlying evidence. Let me give you an example. Meaning what? That the inference, which was the means to get to the particular finding, was too attenuated an inference given the evidentiary base on which it rested? Let me give you an example, Your Honor. If you look at footnote 52 of her decision, that's an example where the commission had characterized a questionnaire response by one of the domestic producers in this case. And the commission characterized what that questionnaire said. She went back and she read the actual questionnaire and asked herself the question, do I think that the actual document supports the characterization that the commission is offering? And in this particular example, she found that it did not. Let's assume that. We've been talking about 12 out of 25. Let's assume that there are portions of her opinion where she was correct, that there was a lack of substantial evidence to support what the commission had concluded. In other respects, she might agree with them. She says, well, it's not highly price sensitive, but it's moderately price sensitive. In one respect, with respect to data, she says the most that can be said is the data pulls in two directions. Well, if it pulls in both directions, I don't know where that stands in terms of not being substantial evidence. So even if you're correct, assume that there are a number of portions in which she correctly concluded and gave us the basis for finding there was no substantial evidence. How do we get from that to a deferment? Here's how you do that. You look at Judge Rustani's decision and you review the evidence with her. In a sense, she's given you a roadmap to what she viewed as the problems with the commission's determination. You see the number of instances. You see, in our view, the vast majority of instances, indeed all instances, where she has correctly criticized the commission either for drawing a conclusion that the evidence doesn't support, drawing something that's too broad, or drawing a conclusion that is ultimately not persuasive. Well, why isn't the right answer in that circumstance for us to remand? Because... You want us to affirm outright the option is remand. So why isn't remand the better choice of those two? Because, Your Honor, this case has been exhaustively discussed below. The commission has had three detailed opportunities to explain itself. The court has reviewed three, in fact, probably four times in detail. The combination of the commission's determinations and Judge Rustani's review gives you as complete a record as you will ever have for evaluating this case. But we have two very thorough, very careful, well-reasoned articulations, if you will, of a vast body of evidence, and those two views are in conflict. And how are we to assess that circumstance, particularly given the standard of review? But with all due respect, Your Honor, I think if you go through issue by issue and look at what Judge Rustani pointed to as the evidence, you will find that it's not really just two different views about the evidence. Her finding at its core is that on issue after issue, the commission simply was drawing conclusions that did not have support either in the evidence the commission was citing to, but also in light of the other evidence that the commission was trying to brush aside. But the problem is it's very difficult on this record to conclude that she was correct in every single instance. Maybe there are many instances where her analysis is correct, but not necessarily all. And that's what we're grappling with. What do we do if we don't agree that in every instance she correctly observed no substantial evidence? Well, Your Honor, that's what the court did the last time this case came up. The last time the court thought there were questions, that the commission should and could address further, and so the court did order a remand. The problem is, and this is really the implication of the current standard of review, which is why we raised the issue, we think this case actually illustrates why in this kind of situation it in fact is more reasonable to apply a did the lower court grossly misapply the standard of review. But if this court upholds its prior decision in Atlantic Sugar and continues to take on the responsibility of duplicating the work of the Court of International Trade, this is the situation you come to. With all due respect, Your Honor, you will never have a completely settled, clean, no more disputes, no more questions on which the agency might have something to say. The practical reality is there will always be a few minor unanswered questions. As long as you look at Judge Rustani's decision and you find that on the vast majority of issues she was correct, and you then step back, and as the court was discussing with the other parties earlier, you step back and ask, what conclusions can one fairly draw from the remaining pieces of evidence, the remaining findings? We believe... If we were to conclude that she was correct on almost everything, then maybe the outcome is not in doubt. But as Judge Lynn and Judge Prost have been asking you to help us with, what happens where we think that of her 25 findings, she was right half the time and wrong the other half the time, and we don't know what the Commission would do with the final determination if we were to run into it and say, you can no longer consider as basis for affirmative injury determination the 12 on which we think she was right in throwing them out, but the other 13 still stand. Okay, Commission, are those 13 enough? Why isn't that a better answer than saying we should decide whether the 13 are enough? Well, Your Honor, hypothetically, it is possible there will be a case in the future where when you sort out where you agree and where you disagree, you're left not certain what the right answer is, and in that case, a remand back to the agency would be appropriate. I'm not talking hypothetically. In this case. I'm saying if we agree with her on exactly half and disagree with her on the other half, how do we have any realistic option other than to remand to the Commission, despite the fact that it would be one more cycle in a horrendously long process? Your Honor, it depends which issues you agree with and which issues you don't agree with, because when you step back, you can put those issues in context, and let me give you a concrete example. Let's say, hypothetically, that you agreed with the Commission on the question of whether there was price undersell. Okay? The existence of price underselling is actually one of the issues, but it's not the core issue in this case. The core issue in this case, these facts, is what effect did any alleged underselling have? And if you agree with Judge Rastani, as she argues eloquently, that there is no evidence to support the conclusion that there was an adverse effect, not just a residual effect, a significant adverse effect from the underselling, then you have a basis for resolving the case now. And that is our position on the facts of this particular case, that the evidence that the price effects were not significant is so strong, and Judge Rastani's rationale is so compelling. Let me give you a few examples of what I think are the central pillars of Judge Rastani's decision, and then you can go back and see whether you agree with her conclusions. Is it useful to talk about price effects being significant versus insignificant? That's so simplistic and binary. Isn't it rather a matter of degree? How significant? Not total significance versus no significance at all, but what gradation of significance? Well, first, Your Honor, we don't have a choice because the statute says significant, so Congress gave us that word. But in terms of applying that word in the statute, I think if you look at the facts of this case, you will actually see pretty compelling evidence that the price effects were not significant. So, for example, Judge Rastani put tremendous weight on the fact that the petitioner in this case, Weirton Steele, when it was doing its everyday business, the contemporaneous business documents, those documents did not identify Japanese competition as the source of their problems. The contemporaneous business documents of the petitioner in this case pointed to other domestic competition, and that finding isn't in isolation. That finding is then combined with the fact that there were purchasers of steel in this case who were getting lower prices without buying any Japanese steel, which is completely consistent with the inference one would draw from the Weirton documents, which is it's about domestic price competition. It's not about the import price competition, and certainly not about the Japanese price competition. So, you look at this... How would I know that? You would know that by reading through the Commission's determination and reading through Judge Rastani's criticism. Well, I've done both, and I don't feel enormously enlightened by it, thank you. Because the Commission considered other evidence as well. It wasn't just left. Nobody just said, Here's the box, and we're considering these two things. We agree or disagree on that. There's other evidence in the record relied on by the Commission. Yes, but at this stage in the litigation, with so many remand determinations that have already taken place, with so much extensive discussion, with all due respect, I don't think the Court is going to hear anything new that is significantly expanding what it already has. And that's the reality that we're facing now. In our view, we think the time has come for the Court to make a decision and to resolve what has already been five years of litigation. Lots of time and energy has been spent on this proceeding, and we think the evidence is quite clear that if you look at Judge Rastani's conclusions and if you look at her explanation of the criticisms, if you look at the conclusions that she is drawing from the evidence that is left, you will agree with her that this determination, that the facts of this case— You make your case too simple. If we are persuaded exactly as you say, of course we can affirm. But the problem is we may end up not at that pole, but somewhere in the middle, pulled in six different directions by hugely complicated evidentiary materials and many, many different factors bearing on many, many different perspectives on the effects of the Japanese pricing. I think you make it too simple. If it were that simple, yeah, of course we affirm. If it's in the middle, then we have a big problem. And I don't think you've helped us as much as you might want to. Well, Your Honor, the way I can help you is if there are points on which you're not clear what the record showed or what Judge Rastani was finding, I'm certainly happy to help with that. All I can offer the Court is that if you go through Judge Rastani's decision and you go through the exercise that you've described, I think the case will be easier than you think it is now. Well, the problem I'm having with this is saying whatever you do, don't send it back to the Commission. Of course, of course, from the perspective of getting an affirmance now and having it all over versus another round, of course you don't want to go back. I wouldn't want to go back either. In the end, we have to decide what we're obligated to do under the law no matter how inefficient that is or how burdensome it is to the party. Maybe Congress has created a cockamamie system that they should change. Maybe it's too burdensome on all of you. It's not up to us to decide that. We have to follow the scheme as Congress enacted it, wisely or not. And so as much as I sympathize with you of let's not have another remand, I don't think that sympathy can play any part in what I finally decide here. No, but with all due respect, Your Honor, I don't think it's about sympathy, although this litigation has gone on for a long time. I think it's about, first, what is the best way for this court to serve its job, which is to evaluate the determination and whether this court decides to give due respect to Judge Rustani's decision. Of course we'll give due respect to her decision and we're compelled to. That's not an issue. That's not in doubt. The question is after we give due respect to her opinion, after we agree with some parts of it, perhaps, and not other parts of it, then what do we do? At that point, Your Honor, you have to look at what parts you have upheld. The difficulty in answering your question is at this point, I don't know which parts you want to agree with Judge Rustani and which parts you don't agree with Judge Rustani. My point is simply that  you should step back and say, which parts of the decision were upheld and what, in fact, would be a kind of, what conclusions could an agency draw from the facts that are remaining? And if you have a question in your mind, if you think there's a question, a fair question, about what the agency would conclude, then, yes, then you have to do a remand. There actually is, after all, an area of territory where you and Mr. Reynolds actually agree that if we're in substantial doubt, we should remand and let the commission decide. But where I think we disagree is when you are done working through Judge Rustani's decision, you will find that on the vast majority of issues, she is correct. And more importantly, on the issues where you may have a disagreement with Judge Rustani, they do not, in a fundamental way, change the basic conclusion that she drew, namely that the commission's conclusion that the Japanese prices were having a significant effect in this case and that the other factors were not severing the causal connection. Our position is that Judge Rustani's decision, even after it's gone through the review by this court, her core building blocks of the decision she reached will be intact and that this court will be able to agree with that. If you've gone through that process and you're not convinced, then the court has no choice but to remand. All right. Thank you, Mr. Gerland. Mr. Reynolds, you've got... Well, you had reserved time, all of which has long since expired, but we'll restore the two minutes that I believe you sought to reserve. I do appreciate that very much, Chief Judge Michell. The felon always has an extra heavy burden in any appeal, so that's the reason you get to speak last, and even two minutes is probably useless. Yeah, it's an unusual posture for us to be up here doing a rebuttal. I wanted to focus on a couple of statements that Chief Judge Michell and Judge Lind made. Judge Lind said, we have here a decision by the court and a decision by the commission, both of which, I think of this as an accurate description of the question you said, were well-reasoned, articulate, and very thorough. And the standard here is if it's well-reasoned and articulated, very thorough on the part of the commission, even if the court's is well-reasoned, articulate, and thorough, then we win. That's what U.S. Steel, it's what the decisions in Universal, Cameron, Consolo, etc., all say. It's about well-reasonedness and articulateness and being thorough, and if it's well-reasoned, that's reasonableness. The other thing, too, is that Chief Judge Michell said that, and I don't want to ascribe to this necessarily, clearly states where you are right now, but the panel is being pulled in six different directions by a hugely complicated set of decisions on a very difficult and complex set of facts. The fact is that, like the issue of reasonableness, that's an issue that this court and the Supreme Court have already resolved. The idea is that, as you said in U.S. Steel, and I'm quoting, the question in this case is not whether we agree with the Commission's decision, nor whether we would have reached the same result as the Commission had the matter come before us for decision in the first instance. By statute, Congress has allocated to the Commission the task of making these complex determinations, and ours is to review those decisions for reasonableness. When it's a situation in which the facts and the record are so complex and there is so much evidence in conflict, the Congress in this court, has consistently said it's the Commission's role to weigh the probative nature of that evidence. And it's the Commission's decision to discern which evidence it's going to give great weight to in that conflicting evidence and which evidence it is not going to give great weight to. That is standard parts of the substantial evidence test, and it is what the court really, I think, needs to pay attention to. All right. We thank all three counsel, all four counsel, three of whom spoke for very forceful, clear arguments. We take the case under advice. Thank you.  Thank you. You got all your stuff? No, I didn't. See you later. Take care. All right. All right. All right. All right.